## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

ALICE MELILLO and ALLEN NORDEN,
*Plaintiffs*,

v.

RYAN BRAIS,
*Defendant*.

No. 3:17-cv-520 (VAB)

## ORDER GRANTING SUMMARY JUDGMENT *SUA SPONTE* AND REMANDING CASE

On February 11, 2019, the Court ordered Alice Melillo and Allen Norden ("Plaintiffs") to appear and show cause as to why summary judgment should not be granted in favor of Ryan Brais ("Defendant") under Federal Rule of Civil Procedure 56(f). Order to Appear and Show Cause, dated Feb. 11, 2019 ("Show Cause Order"), ECF No. 146-1.

On March 5, 2019, the Court held a show cause hearing and reserved decision. Minute Entry, dated Mar. 5, 2019, ECF No. 154.

For the reasons explained below, the Court finds that ("Plaintiffs") have not identified any genuine issue of material fact that is in dispute in this action, and, even if they had, Mr. Brais is entitled to qualified immunity as a matter of law, and the dismissal of Plaintiffs' federal law claims under 42 U.S.C. § 1983.

The Court therefore **GRANTS** summary judgment *sua sponte* under Federal Rule of Civil Procedure 56(f), in favor of Defendant, on Plaintiffs' federal law claims (i.e., Counts One and Two of the Amended Complaint), but declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and remands them to the Connecticut Superior Court in the Judicial District of New London.

# I.      FACTUAL AND PROCEDURAL BACKGROUND

This case arose out of a series of administrative inspections performed by Mr. Brais in his official capacity as a zoning official for the Town of Plainfield, Connecticut. The Court assumes the parties' familiarity with the full factual and procedural background in this case.

The administrative inspections occurred under the authority of a Notice of Violation/ Cease and Desist Order issued by Mr. Brais on April 7, 2015. Amended Complaint, dated Jan. 19, 2018 ("Am. Compl."), ECF No. 64, ¶¶ 11–12. That Order stated as follows:

> **NOTICE OF VIOLATION / CEASE AND DESIST**
> For apartments located in a detached garage at 280 Lathrop Rd, Plainfield.
> [Assessor's Map 1CV, Block 82, Lot 9]
>
> Dear Ms. Melillo,
>
> I have received information that there are two apartments located in the detached garage behind your house at 280 Lathrop Road. The first apartment is located on the first floor, to the right of the garage doors. I first discovered this apartment in 2006 during the construction of the garage. All appliances and fixtures had been removed prior to my inspection and I informed you that per our Zoning Regulations and Health Department approval, no showers or living space could be located in the garage. Only a sink and toilet were allowed in the building.
>
> In 2012, it was suspected that an apartment had been constructed above the garage. The building inspector made an inspection of the garage and found the remnants of an apartment on the first floor, presumably in the same state that I had seen it in 2006, and a finished space above the garage that could have been used as living space. However, a full bath had been removed from this area prior to that inspection, rendering that space unlivable and qualifying it as a bonus or recreation area that was in compliance with our Regulations.
>
> February 20, 2015, the building inspector received a complaint regarding the condition of an apartment located on the first floor of your detached garage, in the same location as the apartment that I discovered in 2006. The building inspector completed the inspection and noted that it is a full apartment and was rented to an Arthur St.

Jean. In addition, Plainfield Police responded to a complaint made by St. Jean of an unlawful entry into his apartment. During that investigation, police went up to the "bonus area" above the garage and interviewed a man who identified himself as the tenant of the second floor area.

It is apparent that there are two apartments located in the detached garage on your property. This use of the garage as dwelling units is in violation of Section 7.2 of our Zoning Regulations entitled Permitted Uses in Residential Zones. Our Regulations do not allow for apartments in detached structures. In addition, the Health Department only permitted a sink and toilet and specifically stated that no dwellings were allowed in the structure.

You are hereby found in Violation of Section 7.2 of our Zoning Regulations and ordered to Cease and Desist all use of the detached garage for dwelling purposes. All plumbing fixtures aside from the sink and toilet located in the garage bay area are to be permanently removed. All kitchen counters and cooking appliances in the two dwelling areas are to be permanently removed.

Within thirty (30) days of receiving this order, you must schedule and allow an inspection to be performed by either myself or the Building Inspector to ensure compliance with this order. Failure to comply with this order will result in court action where the Town will seek damages in the amount of up to $250.00 per day for each day of noncompliance as provided per Section 8-12 of the Connecticut General Statutes, along with reimbursement for all associated court and legal fees.

If you have any questions, I can be reached at 860.230.3036.

Respectfully,
Ryan Brais - CZEO
Zoning Officer
Town of Plainfield

Notice of Violation / Cease and Desist Order, dated Apr. 7, 2015 ("C&D Order"), annexed as

Ex. 1 to Affidavit of Alice Melillo, dated Sept. 3, 2018, ECF No. 113-1.

Plaintiffs did not directly appeal or challenge this Order. Plaintiffs allege that Defendant

"violated the Plaintiffs' right to appeal the Cease and Desist order . . . by using false information

. . . . The Cease and Desist order stated the Plaintiff, Alice Melillo, had 30 days to remedy the alleged violations when actually the 30 days was for the appeal process." Am. Compl. ¶ 9(g).

Following this Cease and Desist Order, administrative inspections occurred on May 27, 2015, June 9, 2015, and July 2, 2015. Am. Compl. ¶¶ 15.

In the Amended Complaint, Plaintiffs, who are proceeding *pro se*, allege that during the June 9, 2015 inspection, Mr. Brais unlawfully opened the doors to a closed wardrobe located in the upstairs area of the detached garage, looked through it, and photographed its contents. *Id.* ¶ 18. Plaintiffs allege that Mr. Brais's inspection was supposed to determine "the existence of 'apartments or dwelling units' allegedly located in the detached garage on the Property," and that Mr. Brais knew or should have known that "the upstairs area of the detached garage on the Property was used as a recreational area and for storage" and was therefore not a proper area for him to inspect. *Id.* ¶¶ 21–23.

Plaintiffs allege that while ostensibly inspecting the wardrobe, Mr. Brais stole from them "a small bag containing miscellaneous, sentimental items and jewelry that had been stored within, was missing," including a 1968 fourteen-karat gold U.S. Marine ring, two 1918 ten-dollar gold coins, miscellaneous military uniform bars and patches, and a pewter cigarette case with a lighter. *Id.* ¶¶ 25–27.

Plaintiffs allege sending Mr. Brais a letter on June 10, 2015, explaining that their belongings were missing. *Id.* ¶ 30. They also claim that, in response to their letter, Mr. Brais wrote to them admitting that he opened the wardrobe and inspected and photographed its contents, but denied taking any of their belongings. *Id.*

In rejecting Defendant's motion to dismiss this claim, the Court construed Plaintiffs to be alleging that Mr. Brais, acting under the color of law, seized Plaintiffs' personal property in

violation of their right to be free from unreasonable searches and seizures. *See* Ruling on Motion to Dismiss the Amended Complaint, dated Apr. 17, 2018, at 8. The Court found that Plaintiffs had alleged sufficient facts to state a claim for relief under the Fourth Amendment and 42 U.S.C. § 1983. *Id.* at 9. The Court also allowed all other Section 1983 claims against Mr. Brais in his personal capacity to proceed, as well as an intentional infliction of emotional distress claim against Mr. Brais in his personal capacity.

Discovery was not stayed due to the motion to dismiss the Amended Complaint, nor was it stayed at any time before that. The parties thus engaged in discovery for approximately eight months until discovery closed on March 30, 2018. *See* Amended Scheduling Order, dated Feb. 8, 2018, ECF No. 76. There was, as a result, ample opportunity for the parties to develop a full evidentiary record with respect to all claims.

On August 3, 2018, Mr. Brais moved for summary judgment on all claims, asserting: (1) Mr. Brais is entitled to qualified immunity with regard to Plaintiffs' constitutional claims under Counts One and Two; (2) Mr. Brais, by commencing and prosecuting a zoning enforcement action, did not violate Plaintiffs' constitutional rights; (3) Mr. Brais did not deprive Plaintiffs of a right to appeal a 2015 cease and desist order; (4) the submission of a proposed stipulated judgment to Plaintiffs did not violate their constitutional rights; (5) Mr. Brais did not seize or take Plaintiffs' personal belongings and is therefore not liable to compensate Plaintiffs; and (6) Plaintiffs' state-law claim for intentional infliction of emotional distress fails as a matter of law. Motion for Summary Judgment, dated Aug. 3, 2018, ECF No. 105.

On August 22, 2018, the Court denied Mr. Brais's motion for summary judgment because the motion's sixty-six page statement of material facts violated this Court's Local Rule 56(a)(1), which limits a statement of material facts to twelve pages absent leave of the Court granted for

good cause shown; the Court therefore denied the motion "in the interest of moving this case at a swifter and more economical pace," consistent with the Court's inherent power to manage its docket and courtroom with a view toward the efficient and expedient resolution of cases. *See* Order Denying Motion for Summary Judgment, dated Aug. 22, 2018 ("Order on Mot. Summ. J."), ECF No. 111, at 4, 6–7 (citing D. Conn. L. Civ. R. 56(a)(1); *Dietz v. Bouldin*, 136 S. Ct. 1885, 1889 (2016)).

In that Ruling and Order, the Court acknowledged Mr. Brais's qualified immunity defense would likely shield him from liability with respect to most of the claims brought in this action under 42 U.S.C. § 1983. Order on Mot. Summ. J. at 7–8. The Court focused on, however, the fact that Plaintiffs may be able to overcome qualified immunity with respect to the alleged seizure of items from their wardrobe, as this was the only conduct still alleged in the Amended Complaint on which the law was "clearly established" at the time of the alleged violation. Order on Mot. Summ. J. at 8 (". . . the law is clearly established that a state official may not take personal property without consent or a warrant, and a reasonable jury at this stage could find that it was not 'objectively reasonable for the defendant to believe that his action did not violate the law.'") (citation omitted).

Thus, the Court explained that a trial could only proceed "[i]f the factual allegations in Plaintiffs' Amended Complaint can be established through the submission of admissible evidence, through sworn affidavits, documents, or otherwise." *Id.* If Plaintiffs could meet that threshold, the Court noted, questions of fact "would remain for the jury to decide." *Id.* at 9.

The Court therefore exercised its inherent power "to manage its docket and courtroom with a view toward the efficient and expedient resolution of cases," *Dietz*, 136 S. Ct. at 1889, ordering Plaintiffs to submit "to provide support for their allegations that Mr. Brais not only

performed an administrative inspection of their private property, but also photographed and/or took their belongings," by September 7, 2018, in order to determine whether this claim against Mr. Brais could survive summary judgment and proceed to trial. Order on Mot. Summ. J. at 9.

Ms. Melillo and Mr. Norden filed a response to that Order on September 4, 2018. Plaintiffs' Response to Order on Mot. Summ. J., dated Sept. 4, 2018 ("Pls.' Response"), ECF No. 113. On October 5, 2018, the Court informed the parties that it had reserved decision as to that submission. Amended Scheduling Order, dated Oct. 5, 2018, ECF No. 118.

On February 11, 2019, the Court ordered Ms. Melillo and Mr. Norden to appear and show cause as to why summary judgment should not be granted in favor of Mr. Brais, observing that, having reviewed the September 4, 2018 submission, "Plaintiffs appear not to have admissible evidence that Mr. Brais took their belongings and thus, lack the genuine issue of material fact necessary to warrant a trial." Show Cause Order at 2. The Court permitted Plaintiffs to file any written submissions in response to its Order to Appear and Show Cause by March 1, 2019.

On February 15, 2019, Plaintiffs moved for clarification of the Court's Order with respect to eight issues including, *inter alia*, whether the Court would be reconsidering its prior order denying Defendant's motion for summary judgment for its procedural defects, and whether the Court would provide "[p]ermission and instructions for the Plaintiffs how to modify a response to either of the Defendant's (denied) Local Rule 56(a)(1) Statements[.]" Motion for Clarification, dated Feb. 15, 2019, ECF No. 148, at 1–2. Plaintiffs further noted that they "are prepared to reiterate their position on March 5, 2019, that the Defendant is not entitled to a qualified immunity defense because his actions were deliberate, that his administrative searches were illegal (because of a fraudulent NOV/C&D order) and against their Constitutional rights; and that

the question of missing personal items (which never were the main issue in this action) is a matter for the jury to determine upon the preponderance of the evidence." *Id.* at 2.

On February 16, 2019, Mr. Brais responded to the motion for clarification. Response, dated Feb. 16, 2019, ECF No. 149. Mr. Brais requested leave to file a response to any submission by Plaintiffs responsive to the Order to Appear and Show Cause. *Id.* at 1. He took no position on the eight issues raised by Plaintiffs. *Id.*

That same day, the Court granted in part and denied in part Plaintiffs' motion. Order, dated Feb. 16, 2019, ECF No. 150. The Court clarified that "[a]s noted in the Court's Order to Show Cause, the Court is considering granting summary judgment under Rule 56(f) of the Federal Rules of Civil Procedure, which permits the Court to consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." *Id.* The Court reiterated that it had "already given Plaintiffs permission to file any written response to the Order to Show Cause by March 1, 2019," and gave Defendant leave to file a response by March 3, 2019 at 12:00 p.m. *Id.* Finally, the Court denied the remainder of Plaintiffs' motion for clarification "either because Plaintiffs, who have chosen to be unrepresented, seek legal advice from the Court or a response is otherwise not warranted." *Id.*

On February 25, 2019, Plaintiffs filed a submission in response to the Order to Appear and Show Cause. Response to Order to Show Cause, dated Feb. 25, 2019 ("Pls.' Show Cause Response"), ECF No. 152. Plaintiffs argued that the Court's August 22, 2018 Ruling and Order required them "to provide proof that the Defendant performed the illegal administrative inspection of their private property (the wardrobe) <u>and</u> photographed their belongings (stored within the closed wardrobe); <u>or</u> the Defendant performed the illegal administrative inspection of their private property (the wardrobe), photographed, <u>and</u> took their belongings." *Id.* at 2. This

interpretation, they believe, was supported by the Order's use of "and/or." *Id.* at 2–3 (citing

Order on Mot. Summ. J. at 9 ("the Court therefore orders Plaintiffs to provide support for their

allegations that Mr. Brais not only performed an administrative inspection of their private

property, but also photographed and/or took their belongings by September 7, 2018.")). Plaintiffs

asserted that they "never accused Mr. Brais (or anyone else) of taking their personal belongings

from the wardrobe" but had "only (and always) stated that, before the second inspection, it was

believed that these items were stored within, and after the inspection they were discovered

missing." *Id.* at 3.

According to Plaintiffs, the Amended Complaint's core claim is that Defendant used

"false, manufactured, fabricated, unsubstantiated information to serve upon the Plaintiff, Alice

Melillo, a Notice of Violation/Cease and Desist order that was the catalyst for three (3) illegal

unwarranted administrative inspections." *Id.* It is Mr. Brais, they insist, who "repeatedly inserted

the subject of the missing personal items in numerous court documents, including his motion for

summary judgment," *id.* at 4, and "has apparently convinced the Court to believe that the missing

personal items are the main issue of this litigation," *id.* at 5. For Plaintiffs, "[t]he question for this

Court to decide is whether or not the Defendant's NOV/C&D was illegal, and therefore

everything that followed was illegal including, (but not limited to), all three inspections of the

Plaintiffs' detached garage on the subject property." *Id.* at 7.

On March 1, 2019, Mr. Brais filed a response to Plaintiffs' submission. Reply to

Response to Order to Show Cause, dated Mar. 1, 2019 ("Reply to Pls.' Show Cause Response"),

ECF No. 153.[1]

---

[1] In this reply, Mr. Brais suggests that the Court does not have jurisdiction over the issue of qualified immunity
because this issue is the subject of his interlocutory appeal pending before the Second Circuit. Reply to Pls.' Show
Cause Response at 3 ("Finally, it is the Defendant's position that the issue of his qualified immunity defense to the

(Continued . . . )

On March 5, 2019, the Court held the show cause hearing and reserved decision. Minute

Entry, dated Mar. 5, 2019, ECF No. 154.

## II.    STANDARD OF REVIEW

A court may grant summary judgment *sua sponte* under Federal Rule of Civil Procedure

56(f) "only '[a]fter giving notice and a reasonable time to respond' and 'after identifying for the

parties material facts that may not be genuinely in dispute.'" *In re 650 Fifth Ave. and Related

Properties*, 830 F.3d 66, 96 (2d Cir. 2016) (quoting Fed. R. Civ. P. 56(f)). Thereafter, if the

record still shows no genuine issue as to any material fact, and a party is entitled to judgment as a

matter of law, the Court may *sua sponte* grant summary judgment in favor of that party.

The judge's function at this stage "is not himself to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial," *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The inquiry performed is the threshold inquiry of

determining whether there is the need for a trial—whether, in other words, there are any genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably

be resolved in favor of either party." *Id.* at 250. "If the evidence is merely colorable, or is not

---

Plaintiffs' claims of illegal searches/inspections is part of the former's first pending interlocutory appeal. If the Second Circuit reverses/vacates the denial of the Defendant's motion for summary judgment, a remand to this Court would require it to consider said immunity defense on its merits. Consequently, the Defendant's qualified immunity defense as to the three purportedly illegal searches/inspections is not at issue in this show cause proceeding.")

As the Court has previously noted, however, the August 22, 2018 denial of Mr. Brais's summary judgment motion was not a decision as to the merits of the substantive legal arguments he made. *See* Order on Mot. to Stay, dated Oct. 29, 2018, ECF No. 130, at 1 ("[T]he substantive legal issue that Mr. Brais claims is implicated by his appeal has not been decided and remains under review by this Court . . . Accordingly, Mr. Brais's motion to stay these proceedings is DENIED."); *see also* Am. Scheduling Order, dated Oct. 5, 2018, at 2 ("An interlocutory appeal does not stay district court proceedings absent an order from the district court or the Court of Appeals[.]") (citing 28 U.S.C. § 1292(b)).

The Court further notes that Mr. Brais never sought leave to take an interlocutory appeal of the Order denying summary judgment. Interlocutory orders, such as the August 22, 2018 Order, are generally not appealable as of right absent an applicable exception. *See S.E.C. v. TheStreet.com*, 273 F.3d 222, 228 (2d Cir. 2001); 28 U.S.C. § 1292.

significantly probative, summary judgment may be granted." *Id.* (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

## III.   DISCUSSION

Plaintiffs' September 4, 2018 response to the Court's August 22, 2018 Order contains only three exhibits that are germane to the allegations related to the second inspection: (1) photos of the interior of the alleged wardrobe in question, which appear to have been produced to Plaintiffs by Mr. Brais in discovery; (2) an affidavit from Mr. Norden; and (3) correspondence between Ms. Melillo and Mr. Brais about the alleged theft.

Because these exhibits, along with evidence submitted with Defendant's summary judgment motion, do not provide admissible evidentiary support for Plaintiffs' claim, the Court concludes there is no genuine issue of material fact requiring a trial.

The Court therefore finds that Defendant is entitled to summary judgment with respect to the second inspection. The Court also finds that Defendant is entitled to qualified immunity with respect to all federal claims, and that this case therefore must be remanded back to the Connecticut Superior Court.

### A.  Evidence Necessary to Get to Trial

"[I] n an ordinary civil case, a plaintiff must present evidence based on which 'reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.'" *Prunier v. City of Watertown*, 936 F.2d 677, 679 (2d Cir. 1991) (quoting *Anderson*, 477 U.S. at 252).

Thus, the Supreme Court has recognized that a plaintiff may not "rest on his allegations . . . to get to a jury without 'any significant probative evidence tending to support the complaint.'" *Anderson*, 477 U.S. at 249 (quoting *Cities Serv.*, 391 U.S. at 290). "[T[he plaintiff

must present affirmative evidence in order to defeat . . . summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Id.* at 257.

"Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citing *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998)). Thus, plaintiffs "'may not rely on mere speculation or conjecture as to the true nature of the facts to overcome'" summary judgment. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). "'[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" *Id.* (quoting *Fletcher*, 68 F.3d at 1456); *see also Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011) ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.") (citations omitted).

Likewise, "a jury may not base its verdict on mere speculation, surmise or guesswork." *Prunier*, 936 F.2d at 680 (citation omitted); *see also Jaquez v. Flores*, No. 10 Civ. 2811 (KBF), 2016 WL 1267780, at *4 (S.D.N.Y. Mar. 30, 2016) ("Plaintiffs have proffered no evidence that supports that wound A was a substantial contributing factor in Jaquez's death. Instead, plaintiffs argue that the jury should be allowed to infer that the wound was a substantial contributing factor without any supportive medical evidence. But this merely seeks to have the jury engage in speculation. There is no principle of law that would allow this.") (citing *Prunier*, 936 F.2d at 680).

The Second Circuit thus has upheld grants of summary judgment for defendants where plaintiffs' allegations were not supported by any probative evidence creating a genuine issue of material fact. *See, e.g.*, *Llewellyn v. Asset Acceptance, LLC*, 669 F. App'x 66, 68 (2d Cir. 2016) ("Llewellyn has not provided any evidence creating a genuine dispute that her debt was sold to the Citibank Trust. The district court correctly determined that there was no genuine issue of material fact as to Asset's valid ownership of the debt.") (citations omitted); *Henderson v. Sikorsky Aircraft Corp., Inc.*, 590 F. App'x 9, 10 (2d Cir. 2014) ("Nor has he produced any evidence suggesting that Sikorsky's explanation is a camouflage for more insidious motives, testifying only to his 'belief' that his failure to receive a pay increase was in fact racially motivated—an entirely speculative assertion that in any event does not speak directly to Henderson's claim of retaliatory animus. Henderson's conclusory allegations thus fail to create a genuine dispute of material fact sufficient to defeat summary judgment.") (citations omitted); *Hicks*, 593 F.3d at 167 ("The following claims were properly dismissed as too conclusory to survive summary judgment . . . . *As to the general claim of sabotage*: Plaintiffs' affidavits on this point lack specifics and are conclusory; a party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove . . . . *As to the compromised security system claim:* Plaintiffs do not assert that it was *Baines* who had compromised the facility's security; instead, they suggest only that 'someone having the security codes and keys to the building' was responsible. Plaintiffs then fail to offer evidence as to which employees had the codes and keys, leaving purely to speculation whether Baines was responsible . . . . *As to the dirty dishes and missing knife claim* . . . . Plaintiffs' assertion that Baines took the knife to retaliate against them—which is explicitly grounded only on their 'information and belief'—is therefore insufficient.") (citations omitted).

### B. Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, "[a] defendant is entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiffs, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law." *Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014) (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 148 (2d Cir. 2006)).

"To overcome the defense of qualified immunity, a plaintiff must show both (1) the violation of a constitutional right and (2) that the constitutional right was clearly established at the time of the alleged violation." *Huth v. Haslun*, 598 F.3d 70, 73 (2d Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

### C. Administrative Searches and the Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. CONST. amend. IV, and "safeguard[s] the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Mun. Court of City & Cty. of S.F.*, 387 U.S. 523, 528 (1967). It is well established that this protection extends to administrative searches by municipal officials. *Camara*, 387 U.S. at 534 ("[W]e hold that administrative searches of the kind at issue here are significant intrusions upon the interests protected by the Fourth Amendment . . . .").

The Fourth Amendment does not, however, require every administrative search by a government official be conducted under a search warrant. *See Nat'l Treasury Emps. Union v.*

*Von Raab*, 489 U.S. 656, 665 (1989) ("While we have often emphasized, and reiterate today, that a search must be supported, as a general matter, by a warrant issued upon probable cause, our decision in *Railway Labor Executives* reaffirms the longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance.") (citing *Skinner v. Rwy. Labor Execs. Ass'n*, 489 U.S. 602 (1989)).

Instead, "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2453 (2015); *see also Airbnb, Inc. v. City of N.Y.*, Nos. 18 Civ. 7712 & 18 Civ. 7742 (PAE), 2019 WL 91990, at *13 (S.D.N.Y. Jan. 3, 2019) ("Outside the criminal context, however, the Supreme Court, in assessing reasonableness, has not insisted on the procedures described by the Warrant Clause . . . . The Supreme Court's assessment of whether searches and seizures outside of the criminal context are reasonable has always turned on the particular circumstances at hand.") (citations omitted).

### D.  The Cease and Desist Order

Plaintiffs argue that the main issue for trial is the legality of the Cease and Desist Order, which they contend was obtained "using lies and false information." Pls.' Show Cause Response at 5. Plaintiffs contend that all searches that flowed from that Order constituted "illegal unwarranted administrative inspections" that "violated the Plaintiffs' constitutional rights to privacy and unwarranted search and seizure." *Id.* at 3.

The Court disagrees.

Because Plaintiffs never appealed the Cease and Desist Order, they have no viable Fourth Amendment claim regarding the alleged invalidity of the Cease and Desist Order.

The Connecticut Supreme Court has held that "[w]hen a zoning inspection is aimed at a particular property . . . the government's interest [in promoting health and the general welfare] does not sufficiently outweigh the threat to individual privacy to warrant suspension of the [F]ourth [A]mendment requirement of particularized suspicion." *Town of Bozrah v. Chmurynski*, 303 Conn. 676, 691 (2012). The Connecticut Supreme Court has accordingly interpreted Connecticut General Statute § 8-12—which grants municipal zoning enforcement officials the power to enforce zoning regulations through cease and desist orders, inspections, and civil actions—as authorizing "that official to take enforcement action through available methods at law" in accord with the requirements of the Fourth Amendment. *Id.* at 685 n.5 (citing CONN. GEN. STAT. § 8-12).

The Fourth Amendment does not, however, require a warrant for all administrative searches of a home. It only requires one—or its functional equivalent—to be sought when a homeowner refuses to give their consent to that administrative search. *See id.* at 693–96 (holding that a trial court's grant of preliminary injunction under CONN. GEN. STAT. § 8-12 when homeowner refused to permit inspection of his property served the "functional equivalent" of a warrant "such that the resulting search would be reasonable nevertheless," because such a hearing, which results in a preliminary finding of probable cause, satisfies the purposes of the Fourth Amendment in ensuring that the search is reasonable).

After the Cease and Desist Order issued, Plaintiffs had an opportunity to appeal to the Board of Zoning Appeals and challenge that order, and therefore to prevent any subsequent administrative inspections/searches. But they did not avail themselves of this process. Instead,

they chose not to appeal, and proceeded to schedule the three subsequent inspections of their property.[2]

Under Connecticut law, local zoning boards of appeals have the power to "hear and decide appeals where it is alleged that there is an error in any order, requirement or decision made by the official charged with the enforcement of this chapter or any bylaw, ordinance or regulation adopted under the provisions of" Chapter 124 of the Connecticut General Statutes, which sets the legal framework for zoning for all Connecticut municipalities. CONN. GEN. STAT. § 8-6(a)(1). "Any person aggrieved" by a zoning enforcement official's order, requirement, or decision has the right to appeal "within such time as is prescribed by a rule adopted by said board, or, if no such rule is adopted by the board, within thirty days, by filing with the zoning commission or the officer from whom the appeal has been taken and with said board a notice of appeal specifying the grounds thereof." CONN. GEN. STAT. § 8-7. The appeal period begins "at the earliest of the following: (1) Upon receipt of the order, requirement or decision from which such person may appeal, (2) upon the publication of a notice in accordance with subsection (f) of section 8-3, or (3) upon actual or constructive notice of such order, requirement or decision."

The Town of Plainfield's own zoning regulations, which are also publicly available, provide that the Zoning Board of Appeals has the power to "hear and decide appeals where it is alleged that there is an error in any order, requirement, or decision made by the official charged

---

[2] Mr. Brais has separately argued that the "consent exception" to the Fourth Amendment probable cause requirement applies here and justifies his inspections. Defendant's Memorandum in Support of Mot. Summ. J., dated Aug. 3, 2018, ECF No. 105-1, at 5 (citing *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) ("It is by now well established that while a warrantless search of a home is generally unreasonable and therefore violates the Fourth Amendment, which proscribes 'unreasonable searches,' an individual may consent to a search, thereby rendering it reasonable.") (citations omitted). The Court finds that it need not address this exception here because the cases where it is invoked generally involve situations where police officers or government agents seek consent to an immediate search. *See, e.g.*, *Garcia*, 56 F.3d at 420–21 (discussing circumstances of search where officers traveled to residence unannounced and sought search of residence); *Schneckloth v. Bustamonte*, 412 U.S. 218, 221 (1973) (in search following motor vehicle stop, State required to demonstrate that consent was, in fact, voluntarily given). Because the circumstances here differ, the Court declines to adopt this alternative argument.

with the enforcement of these regulations." PLAINFIELD, CONN., ZONING REGS. § 16.3.1. Because Plainfield has not separately adopted a time period for appeals, Plaintiffs were subject to the state statute's thirty-day time limit for filing an appeal. If the Board of Zoning Appeals upholds the zoning enforcement official, the person aggrieved may take an appeal to the Connecticut Superior Court. CONN. GEN. STAT. § 8-8(b). That Court may, "after a hearing thereon, reverse or affirm, wholly or partly, or may modify or revise the decision appealed from." CONN. GEN. STAT. § 8-8(*l*). From there, the person aggrieved can take another appeal to the Appellate Court "on the vote of two judges of the Appellate Court so to certify and under such other rules as the judges of the Appellate Court establish." CONN. GEN. STAT. § 8-8(o).

Plaintiffs did not avail themselves of any of their appeal rights. They now claim that their rights to appeal were obscured by the wording of the Cease and Desist Order. Am. Compl. ¶ 9(g) ("The Defendant, violated the Plaintiffs' right to appeal the Cease and Desist order (4/7/15) by using false information that was clarified later by the town attorney. The Cease and Desist order stated the Plaintiff, Alice Melillo, had 30 days to remedy the alleged violations when actually the 30 days was for the appeal process.").

No state statute obligated Mr. Brais to provide legal information or advice to Plaintiffs about how to appeal his orders. *See Cardwell v. Town of Granby Zoning Bd. of Appeals*, No. HHDCV105035217S, 2012 WL 234154, at *2 (Conn. Super. Ct. Jan. 4, 2012) ("[T]he court can locate no authority imposing a requirement that the plaintiff be notified of his right to appeal within the statutory time period. The only requirement regarding notice is that the aggrieved party be notified of the decision from which an appeal can be taken; in this case, Cardwell was notified of the ZEO's decision.") (citations omitted).

The Court further notes that Mr. Brais's order actually pointed them in the right direction by identifying the local zoning regulation Plaintiffs were alleged to have violated and a relevant state statute providing him authority to pursue civil penalties and fines for non-compliance. C&D Order at 2 (citing PLAINFIELD, CONN. ZONING REGS. § 7.2 and CONN. GEN. STAT. § 8-12). Had Plaintiffs reviewed the adjacent Plainfield Zoning Regulations or Connecticut General Statutes— or obtained the advice of counsel—they could have learned how to file an appeal.

Finally, the record reveals that Plaintiffs, in fact, learned of their appeal rights from Town Attorney Mark Branse only three days after the Cease and Desist Order issued. *See* Letter to Mark Branse, dated Apr. 15, 2015, annexed as Ex. 11 to Pls.' Response ("Your letter dated 4/10/15 stated that 'the order issued by the Zoning Enforcement Officer must be appealed to the Zoning Board of Appeals within thirty (30) days of receipt of the order or the opportunity for such an appeal is lost forever."). Plaintiffs conceded, at oral argument, that they had learned of these appeal rights, but contend that they were told by someone at Plainfield Town Hall that the appeal would cost $700 to file and they decided not to incur that expense.

Plaintiffs' allegations that Mr. Brais somehow obscured their appeal rights thus are wholly without merit.

Defendant argued in his motion for summary judgment that a Cease and Desist Order alleging zoning violations in the attached garage that was issued, and was not directly appealed by Plaintiffs, is presumptively valid under Connecticut law and may not be collaterally attacked in a later-filed civil action absent exceptional circumstances. Def.'s Mem. in Support of Mot. Summ. J., dated Aug. 3, 2018, ECF No. 105-1, at 12 & n.3.

The Court agrees.

"[A]s a general rule, litigation about the merits of a cease and desist order does not permit a collateral attack on the validity of the underlying zoning decision that was not challenged at the time that it was made, even if the collateral attack is on jurisdictional grounds." *Lallier v. Zoning Bd. of Appeals of Town of Stafford*, 119 Conn. App. 71, 78 (2010); *see Masayda v. Pedroncelli*, 43 Conn. App. 443, 447 (1996) ("When a party has a statutory right of appeal from the decision of an administrative officer or agency, he may not contest the validity of the order if zoning officials seek its enforcement in the trial court after the alleged violator has failed to appeal.") (citing *Gelinas v. West Hartford*, 225 Conn. 575, 596 (1993) (holding that "the validity of the order may not be contested if zoning officials seek its enforcement after a violator has failed to appeal.")).

Because these searches were conducted more than thirty days after the issuance of the Cease and Desist Order, and that order was not appealed, the Court finds that the legality of the Cease and Desist Order is not a material issue of fact to be determined by a jury. Plaintiffs' claims about the illegality of the Order, and the searches, therefore fail for two distinct reasons.

First, because the Cease and Desist Order was not appealed, administrative searches taken under its authority cannot support a Fourth Amendment claim as a matter of law. Plaintiffs had their opportunity to demand a finding of probable cause, and to test the veracity of the facts that they now claim were lies and false information, by taking an appeal to the Board of Zoning Appeals. Had they failed there, the statute authorized them to take that appeal through the Connecticut courts. In short, they had more than an adequate opportunity to seek "precompliance review before a neutral decisionmaker." *Patel*, 135 S. Ct. at 2452. But because they chose not to take an appeal in the statutorily-required time, they lost that opportunity; instead, they went ahead and scheduled the three administrative inspections and took other steps to come into

compliance with the Cease and Desist Order. Their Fourth Amendment claim here then fails as a matter of law.

Second, even if that was not the case, because Mr. Brais was acting under the authority of a presumptively valid Cease and Desist Order, he was not acting contrary to any "clearly established statutory or constitutional rights of which a reasonable person would have known" and therefore is entitled to qualified immunity with respect to his decision to schedule the administrative inspections, at times agreeable to Plaintiffs, and to undertake the inspections.

Accordingly, Mr. Brais is entitled to summary judgment on these claims.

### E.  Wardrobe Theft Claim

As the Court previously advised Plaintiffs, Plaintiffs' allegation that Mr. Brais seized their property—the alleged bag of valuables—in violation of their Fourth Amendment rights to be free from unreasonable searches and seizures might not be subject to a qualified immunity defense. Because the Court found this allegation, if properly supported, would allow Plaintiffs to overcome a defense of qualified immunity, it ordered Plaintiffs to submit admissible evidence to support their allegation.

Plaintiffs now insist that they never alleged Mr. Brais stole their valuables, but merely pointed out that the valuables were present before his search and missing after it. This is a distinction without a difference.

In response to the Court's August 22, 2018 Order, Plaintiffs submitted numerous exhibits, but most are irrelevant to the second inspection. The only exhibits relevant to the second inspection are: (1) photos of the interior of the alleged wardrobe in question, which appear to have been produced to Plaintiffs by Mr. Brais in discovery; (2) correspondence

between Ms. Melillo and Mr. Brais about the second inspection and alleged theft; and

(3) affidavits from Plaintiffs and their son, Matthew Melillo.

### 1. Photos

The photos submitted by Plaintiffs appear to have been produced by Mr. Brais in discovery, and correspond with Mr. Brais's admission that he photographed the contents of the wardrobe:





Ex. 17 to Pls.' Response, ECF No. 113-1, at 67–68. But photographing the wardrobe was not, in and of itself, a clearly established violation of law. The photos are only relevant, to the extent that they support the allegation of improper seizure of the bag.

The photos do not document the presence of the bag in question, nor do they document the alleged seizure of the bag. They simply establish that Mr. Brais did open the wardrobe and photograph its contents—a fact that is not in dispute. As a result, they do not create a genuine issue of material fact.

### 2. Correspondence

Plaintiffs have also submitted correspondence between them and Mr. Brais following the second inspection. On June 10, 2015, Ms. Melillo wrote the following letter to Mr. Brais:

> Mr. Brais,
>
> Our son just got up and informed us about the inspection yesterday. He said that after you and Mr. Kerr had finished looking at and photographing the "removed bathroom", he went in to take our own pictures of the area. When our son came out, Mr. Kerr had already exited the upstairs and he found you looking in our personal property (closing the doors to a wardrobe). When he asked what you were doing, you said it was *part of a 2nd documentation.* We can only assume that you had also photographed our personal property stored within.
>
> We just went upstairs to see if anything else had been disturbed and to our astonishment my husband said that he had stored a bag containing some old military jewelry and mementos in that cabinet/wardrobe and the bag was missing. We will continue to search for the missing items just in case he was mistaken. However, if we are unable to locate these items, we will then decide the right course of action to take. The value of these items are priceless; they cannot be replaced.
>
> **We know and you know you had no right to go into anyone's personal belongings.**
>
> The *purpose* of this 2nd inspection was to confirm there was no bathroom facilities, kitchen or cooking appliances in the upstairs

recreation area of the garage. This inspection has satisfied those stipulations.

Ex. 17 to Pls.' Response, ECF No. 113-1, at 69.

The same day, Mr. Brais responded with the following letter:

> Dear Alice and Allen,
>
> I am in receipt of your letter regarding our inspection yesterday morning of the detached garage, and your claim that I may have taken a bag containing "military jewelry and mementos'' from a stand-alone wardrobe.
>
> To recap my inspection, after I photographed the plumbing in the garage, I moved upstairs and photographed the bathroom. Your son then photographed the bathroom as I moved on to photograph the rest of the apartment to document any possible changes from my last inspection. I did photograph the contents of the stand-alone wardrobe, which was mostly clothing. Your son observed this and asked something along the lines of, "Do you really have to take pictures of Rudy's clothes?" So my question to you is, do you keep your cherished mementos and jewelry mixed in with other people's personal belongings? If it was in fact in the wardrobe that Rudy uses for his clothes, who is to say that he did not move this bag?
>
> Rob Kerr, Building Inspector, had not exited the upstairs as your son had stated. He was standing in the doorway watching my actions and observed this brief conversation between me and your son. In addition, if you recall, I was wearing a tight-fitting shirt and jeans. I had no bag with me and no place to hide a bag of mementos and military jewelry. Not only did your son follow me out, but I spoke with you for several minutes before leaving. Surely you would have noticed if I was holding any such bag.
>
> If you feel that I have taken anything of yours, please contact the police immediately for a full investigation.

Ex. 18 to Pls.' Response, ECF No. 113-1, at 71.

Two days later, Ms. Melillo replied in a lengthy letter. In relevant part, it states:

> I received your certified letter dated 6/10/15 yesterday. I want to make it perfectly clear to you **again** that the upstairs area over our detached garage was designed as a replacement area for a basement

which our house is not equipped with. The area in question has been used for gaming, TV watching, and mostly for storage.

I have lived in this home for over 36 years and have accumulated a lot of stuff. These items obviously cannot be stored within our dwelling, but are things I refuse to part with. Some of the items belonged to my deceased parents. Some are items from my daughter's and son's childhood. There is also miscellaneous hems being stored there which belong to my husband, my son, my married daughter. There is even a bed and mattress set and other miscellaneous items stored for one my daughter's friends when she was going through a divorce. And yes, there are clothing items being stored there for our friend Rudy, who rents a room in our home.

Also, my husband does not have to explain to you or anyone else where or why he would store any of his belongings on our property. That is his business - not yours or anyone else's. What were you doing going through a clothes wardrobe without permission? And why did you need to take photographs of the inside contents? Even the police can't do that without probable cause. To your statement that maybe "Rudy" may have been responsible for the missing items; our answer is absolutely not. "Rudy" is and continues to be a man of sound character. His integrity is impeccable and unquestionable.

The missing bag of mementos included my husband's 14 karat gold U.S. Marine Corp. ring purchased in 1968 (during his service to our country) and a $10 gold piece which belonged to my father. After much discussion we have decided, should we determine it necessary to involve the authorities, we will contact the CT State Police in order to avoid any type of conflict of interest. At this time we are trying to locate a 2005 appraisal we had of the items. The upstairs area had been locked prior to the inspection and relocked immediately after. After our son reported the incident with the wardrobe, my husband went upstairs, looked around, and found the bag of items to be missing.

Ex. 19 to Pls.' Response, ECF No. 113-1, at 72–74.

The fact that these letters were written is not in dispute and cannot create a genuine issue of material fact. These letters simply establish facts not in dispute: that Mr. Brais opened the wardrobe, inspected, and photographed its contents.

The letters also show that neither Ms. Melillo nor Mr. Norden directly observed any circumstances of the alleged theft of their bag; any testimony of theirs on this subject, then, would merely involve reporting on their son's account. *See* Ex. 17 ("Our son just got up and informed us about the inspection yesterday."); *see also* Affidavit of Alice Melillo, dated Sept. 3, 2018, annexed to Pls.' Response, ECF No. 113-1, ¶ 42 ("Allen was very sick; possibly pneumonia, and did not accompany them on the inspection. My son Matthew Melillo did so on Allen's behalf."); Affidavit of Allen Norden, dated Sept. 3, 2018, annexed to Pls.' Response, ECF No. 113-2, ¶ 66 ("The next morning around 10:00 a.m. was the first chance we had to speak to Matthew in detail about the inspection . . . . He told us he said (to Brais), 'What are you doing taking pictures of people's personal belongings.'").

While the letters suggest that perhaps Plaintiffs' son, Matthew Melillo, could testify at trial about the inspection of the cabinet and circumstances of the alleged theft, Matthew Melillo's deposition testimony reveals otherwise:

> Q. Okay. Did you go back upstairs after Mr. Brais and Mr. Kerr left and look in the clothing wardrobe?
> A. No.
> Q. Okay. When was the last time you had looked in the clothing wardrobe before the inspection?
> A. I don't recall.
> …
> Q. What to your knowledge was in the clothing wardrobe at the time of the inspection?
> A. I don't know.
> …
> Q. Do you even know what the items are that were allegedly taken out of the wardrobe?
> A. I do not.
> Q. Have you ever seen them?
> A. No.

Transcript of Deposition of Matthew Melillo, annexed as Ex. E to Def.'s Local Rule 56(a)(1) Statement, ECF No. 105-8, at 34:2–7, 11–13, 39:3–7.

The letters therefore do not create the genuine issue of material fact necessary for a jury trial.

### 3. Affidavits

The final relevant exhibits are affidavits from Ms. Melillo, Mr. Norden, and Matthew Melillo. Ms. Melillo's affidavit contains the following paragraphs that speak to the second inspection and alleged theft:

> 42. On June 9, 2015, Mr. Brais and Mr. Kerr arrived for the second inspection. Allen was very sick; possibly pneumonia, and did not accompany them on the inspection. My son Matthew Melillo did so on Allen's behalf.
>
> 43. On the morning of June 10, 2015, around 10:00 a.m., Allen, Matthew, and myself had a conversation about the (second) inspection that took place the day before.
>
> 44. Matthew told us that Mr. Brais had gone into the closed wardrobe and taken photographs of the contents.
>
> 45. Allen got up from the table and walked, across the yard and up the stairs of the garage.
>
> 46. When he came back in the house he said, "It's gone." I said, "What's gone." He then said, "The bag with my ring and your dad's stuff. I put in the wardrobe and its gone."

Affidavit of Alice Melillo, dated Sept. 3, 2018, annexed to Pls.' Response, ECF No. 113-1, ¶¶ 42–46.

Mr. Norden's affidavit contains the following paragraphs that speak to the second inspection and alleged theft:

> 64. The (2nd) inspection took place on June 9, 2015. I had a real bad cold (maybe pneumonia) and could barely breathe so I asked my son, Matthew to accompany Brais and Kerr on this inspection. Matthew also took photos. The inspection started throughout the downstairs of the garage (again) even though there were no violations found on the 1st inspection.

65. The inspection moved on to the upstairs; maybe taking another 8-10 minutes.

66. Kerr had come downstairs first. He was walking around his vehicle and talking on his phone. Brais came down 3-5 minutes later; followed by Matthew.

67. I asked Matthew if he had locked the door and he said, "Yeah, dad."

68. Brais came over to speak to me. He stood about 3 feet in front of me; his right hand in his right front pocket the entire time. I asked him, "Well, did I rip out enough of the building to satisfy you?" He said, "I don't know. I'll have to run it by the attorney and see what she says."

69. The next morning around 10:00 a.m. was the first chance we had to speak to Matthew in detail about the inspection. He told us how he had been in the bathroom area photographing what Brais had just taken pictures of. He walked out of the "bathroom area" and he caught Brais with the doors opened to the (closed) standing wardrobe and taking pictures of the contents. He told us he said (to Brais), "What are you doing taking pictures of people's personal belongings."

70. My wife and I just looked at each other with our mouths wide open. I got up and walked up to garage and went upstairs.

71. Sometime before that inspection I had put a "zippered" sandwich bag containing several sentimental items, in the wardrobe upstairs in the garage for safe keeping. My theory was, if our property was ever the target of a burglary, it would be the house that would be targeted – not a storage area above the garage.

72. The bag was a zippered sandwich bag; small and the contents were flat with the exception of my Marine Corp. ring (which was the size of a man's high school ring). This bag could have easily been concealed in a pocket or the waistband of a pair of pants (front or back).

73. I came back within maybe 5 minutes and it took me several minutes to catch my breath before I told Alice that the bag I had stored in the wardrobe was gone.

Affidavit of Allen P. Norden, III, dated Sept. 3, 2018, annexed to Pls.' Response, ECF No. 113-2, ¶¶ 64–73.

Matthew Melillo's affidavit contains the following paragraphs that speak to the second inspection and alleged theft:

> 15. On June 9, 2015, my Father asked me if I would accompany Mr. Brais on a second inspection of the detached garage and take photographs as I had previously done. My Father was unable to participate because he was suffering from a severe cold and due to his COPD (chronic obstructive pulmonary disease) though it would be best not to go up and down the stairs.

> 16. Mr. Brais, Mr. Kem, and I started the inspection in the lower level of the garage; moving through the two bays and the room to the right of the bays. Everything was the same as in his first inspection on May 27, 2015. Photographs were taken by Mr. Brais and myself (as before).

> 17. The three of us proceeded up the stairs. I unlocked the door and all of us entered. Mr. Brais proceeded to take pictures, so I followed suit. As I remember, everything was basically the same as the first inspection, except my Father had removed the toilet and vanity/sink. Both Mr. Brais and I took pictures of the gaping holes in the wall and floor where the plumbing had all been ripped out.

> 18. Mr. Brais finished photographing the area where the toilet and sink had been and then he went back into the main room. As I entered the main area (approximately l0 seconds after Mr. Brais), I glanced to my right and saw Mr. Kerr standing in the doorway to the deck outside (approximately 25 feet away). I immediately looked to my left and caught Mr. Brais with the doors open to a free-stand (closed) clothing wardrobe. He was photographing the contents of the wardrobe. I asked him, "'What are doing going in people's personal belongings?" He closed the doors and answered, "This is part of a second documentation."

> 19. Mr. Brais proceeded to the same door where I had previously seen Mr. Kerr (standing in) and exited the upstairs. Mr. Kerr was already outside and downstairs. As I left the upstairs, I locked the door.

> 20. I cannot testify to any further interaction between my Father, Mr.
> Brais, or Mr. Kerr. I walked down to the house, to prepare to go
> about my own business and prepare for work.
>
> 21. At approximately 10:00 a.m. on June 10, 2015, I spoke to my
> Father for the first time since the inspection ended. I reiterated my
> observations of the inspection. That is the first time I told my Father
> about Mr. Brais going in the wardrobe and the conversation that
> followed.

Affidavit of Matthew Melillo, dated Sept. 3, 2018, annexed to Pls.' Response, ECF No. 113-2,

¶¶ 15–21.

These paragraphs offer no additional evidence that Ms. Melillo, Mr. Norden, or Ms. Melillo's son would be able to testify to having witnessed Mr. Brais take anything out of the wardrobe. *See* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *cf. Beyah v. Coughlin*, 789 F.2d 986, 989 (2d Cir. 1986) ("This requirement means that hearsay testimony that would not be admissible if testified to at the trial may not properly be set forth in the Rule 56(e) affidavit.") (citations, internal quotation marks, and alterations omitted) (citing pre-restyling version of FED. R. CIV. P. 56(c)(4)). They also do not contain any specific facts or circumstances that would suggest that this would be a reasonable inference for a jury to make. *See Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) ("Such testimony, unsupported by documentary or other concrete evidence of the supposed lead line effect, is simply not enough to create a genuine issue of fact in light of the evidence to the contrary."); *D'Amico*, 132 F.3d at 149 ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."); *Prunier*, 936 F.2d at 679 (in an ordinary civil case, a plaintiff must

present evidence based on which "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.").

There are no facts in this record narrowing the possibilities as to what happened to the bag. *See, e.g.*, *Cities Serv.*, 391 U.S. at 284–86 (explaining that the plaintiff in *Poller v. Columbia Broad. Sys.*, 368 U.S. 464 (1962), could survive summary judgment, despite lack of direct evidence as to motives of CBS in canceling its affiliation with the plaintiff, because evidence showed that "the competitive relationship between CBS and the plaintiff was such that it was plausible for the plaintiff to argue that CBS had embarked on a plan to drive him out of business."); *Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 65 (2d Cir. 2003) ("Choosing one explanation over another without more evidence is a matter of speculation . . . .") (citation omitted). As a result, Plaintiffs simply would be asking the jury to agree with their speculation about what might have occurred. *See Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 177 (2d Cir. 2003) ("NMPC argues that the presence of BTEX and PAHs in the surrounding environment permits an inference that MVO was the source of the contamination since these components were found in the fuel oil stored by MVO. However, these same substances are also by-products of NMPC's manufactured gas operations. NMPC argues that the question of whether these substances came from MVO, NMPC or some other defendant is for the fact-finder to resolve. But because there is no evidence that points to one party rather than another, the only basis for such a jury finding would be impermissible speculation.").

The Court therefore finds that Plaintiffs are not entitled to a trial on their claim that Mr. Brais illegally seized their items. To be clear: the Court takes no position as to whether or not Mr. Brais actually took the items. It simply finds that based on the record before the Court, no

reasonable fact finder could infer that Mr. Brais took the items. Under the Federal Rules of Civil Procedure, the Court therefore is obligated not to permit such a case to proceed to trial.

Accordingly, the Court finds Defendant is entitled to summary judgment on this claim.

### F. Emotional Distress Claim

Because qualified immunity does not provide a defense to state-law intentional torts, it does not provide a defense to Plaintiffs' state-law intentional infliction of emotional distress claim. *See Schnabel v. Tyler*, 230 Conn. 735, 741 (1994) ("Qualified immunity may serve as a defense to civil suits brought pursuant to § 1983, but not to common law actions predicated on intentional torts."); *accord Williams v. Hauser*, No. 3:96-cv-786 (AHN), 1998 WL 241218, at *7 (D. Conn. May 7, 1998).

Having determined that all federal claims over which the Court had original jurisdiction should be dismissed, however, the Court may decline to exercise supplemental jurisdiction over Plaintiffs' state-law claim. 28 U.S.C. § 1367(c)(3); *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'") (quoting 28 U.S.C. § 1367(c)(3)).

"Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity' in deciding whether to exercise jurisdiction." *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) and citing *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 446–47 (2d Cir. 1998). "In weighing these factors, the district court is aided by the Supreme Court's additional guidance in *Cohill* that 'in the usual case in which all federal-law claims are eliminated before

trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Id.* (quoting *Cohill*, 484 U.S. at 350 n.7).

The Court finds that the balance of the *Cohill* factors makes this the usual case, and therefore declines to exercise jurisdiction over the state-law intentional infliction of emotional distress claim. Accordingly, this case should be remanded to Connecticut Superior Court.

## IV. CONCLUSION

Plaintiffs have failed to submit evidence suggesting that a genuine issue of material fact remains for trial. In addition, at the hearing held on March 5, 2019, Plaintiffs did not offer any additional evidence that could suggest a genuine issue of material fact remains for trial.

For the reasons explained above, the Court *sua sponte* **GRANTS** summary judgment in favor of Mr. Brais as to Counts One and Two. The federal claims in Counts One and Two of the Amended Complaint therefore are dismissed.

Any remaining state law claims in Count Three of the Amended Complaint are **REMANDED** to the Connecticut Superior Court in the Judicial District of New London.

The Clerk of the Court is respectfully directed to enter judgment for Mr. Brais on the federal claims and close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 11th day of March, 2019.

　　/s/ Victor A. Bolden
Victor A. Bolden
United States District Judge